# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 2, 2016

## STATE OF TENNESSEE v. CORDRICUS ARNOLD

### Appeal from the Criminal Court for Shelby County
### No. 1303894     W. Mark Ward, Judge

_____

### No. W2015-00702-CCA-R3-CD  -  Filed April 26, 2016

_____

The defendant, Cordricus Arnold, was convicted of first degree (felony) murder.  On appeal, he argues that the evidence was insufficient to sustain his conviction and that the trial court erred by failing to instruct the jury regarding the offense of voluntary manslaughter.  Following our review of the briefs of the parties, the record, and the applicable law, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Stephen C. Bush, District Public Defender; and Barry W. Kuhn (on appeal) and Kamilah Turner and Cliff Abeles (at trial), Assistant District Public Defenders, for the Appellant, Cordricus Arnold.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Stark and Reginald Henderson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

This case arose after the victim was stabbed behind a Memphis restaurant. In a statement to police, the defendant said that on the evening of March 23, 2013, he was in a Kroger grocery store "[t]o get warm." The Kroger was in the same shopping center as the restaurant El Toro Loco, and the store was adjacent to the restaurant. The defendant said that he was wearing a "[b]lack hoodie and some black pants and some orange and gray shoes," and video footage from the store depicted the defendant in this attire. The defendant exited the store without making a purchase, and he "went to the back of Kroger and just sat there." While sitting behind the store, the defendant noticed the victim, who worked at El Toro Loco, when the victim was taking out the trash. The defendant approached the victim when he was emptying bottles and boxes into the trash. The defendant said that the victim turned around "because I guess he saw a shadow and he tried to use the bottles to hit me with them. I guess he realized what I was fixing to do." The defendant then pulled out a knife and stabbed the victim with a "[b]lack butcher knife." The victim ran into the restaurant, and the defendant said that he followed him in an attempt to find the victim's car keys. He explained that he wanted to obtain the victim's keys so that he would have a place "to lay [his] head."

Video footage from inside the restaurant showed the victim loading boxes into a cart and then pushing the cart toward the rear exit of the restaurant. A little over one minute later, the victim came back into the restaurant and collapsed writhing on the floor. Shortly thereafter, the defendant came into the restaurant. The footage showed that he was holding a butcher knife and wearing a black hoodie and black pants, and the footage clearly shows the defendant's face. The video captured the defendant placing the knife on a counter and walking from one end to the kitchen to the other several times. The defendant then retrieved the knife and knelt over the victim's body. The defendant stated that he took the victim's keys and wallet and left in the victim's vehicle, which he described as a "[g]reen" truck.

Jose Miranda testified that he worked at El Toro Loco with the victim. He testified that the victim drove a green RAV 4 and that he usually parked behind the restaurant. He stated that on the evening of the victim's death, he and the victim were cleaning up the restaurant, and the victim went outside alone to take some boxes to the dumpsters behind the restaurant. A short time later, the restaurant supervisor asked Mr. Miranda if he knew where the victim was, and Mr. Miranda replied that he did not. Mr. Miranda went to look for the victim in the back of the restaurant and found him lying dead on the floor in the kitchen. Mr. Miranda rushed back to his manager and told him to call the police.

Members of the Memphis Police Department ("MPD") homicide bureau and crime scene unit were dispatched to the scene. Sergeant Kevin Lundy obtained footage from the cameras in the restaurant, and he had a video analyst create still photographs from

images in the videos. Sergeant Lundy contacted Cecil Wages, who was a loss prevention officer for Kroger and a reserve MPD officer, and provided him with a still photograph of the defendant from inside the restaurant. Mr. Wages examined the footage from the Kroger adjacent to El Toro Loco, and he discovered that a person matching the defendant's description was in the Kroger about two hours before the victim was stabbed. Mr. Wages sent the video to the homicide bureau, and they verified that the person in the video was their suspect.

Four days after the killing, Sergeant Robert Wilkie received a call informing him that the victim's vehicle was parked behind El Toro Loco. Officers recovered the vehicle, and Officer Michael Coburn processed the vehicle. He discovered the victim's wallet and credit card in the cupholder of the vehicle. He also tested the vehicle for fingerprints, and he sent eight samples to the latent print unit.

Officer Nathan Gathright, who worked in the latent print unit, testified that he compared the fingerprints taken from the victim's vehicle to the defendant's fingerprints. Of the eight prints recovered, he identified three as a positive match to the defendant. After learning of the match, Sergeant Lundy began investigating the defendant and ascertained his home address. Officers went to the home, where they spoke with L.C. Townsend.

Mr. Townsend testified that he used to live with the defendant's mother, the defendant, and several other family members. At the beginning of March, the family moved into a new residence. Around two or three weeks later, the defendant moved out of the residence and stopped spending the night. At the time, he did not have a car. Mr. Townsend testified that the defendant returned nearly a week later, and he was driving a green RAV 4. He testified that the shopping center containing the Kroger and El Toro Loco was a seven to ten minute walk from the residence.

Officers learned that the defendant was possibly working at a Honeybaked Ham, and Sergeant Lundy dispatched a task force, which included Officer William Lane, to arrest the defendant. Officer Lane testified that when he arrived at the eatery, he was told that the defendant was not there. Officers looked around the restaurant for several moments, and they saw the defendant exit a broom closet and race out the back door. Officer Lane and his partner pursued the defendant for one and a half miles on foot. When officers apprehended the defendant, a struggle ensued. Officer Lane testified that the defendant kicked him in the chest and another officer in the face before he was subdued. Officers then took him to "the Med" to be examined, and he was treated for very minor injuries.

After leaving the hospital, the defendant was taken to the precinct, where he spoke with Sergeant Lundy. The defendant waived his *Miranda* rights, and he told Sergeant Lundy that he was responsible for the victim's death. In addition to the details surrounding the stabbing of the victim, the defendant said that he returned the knife to his mother's home. He explained that he returned the truck to the restaurant after he learned that authorities were searching for the vehicle. He stated that he "wiped the steering wheel, door handle, and the front seat" before returning the vehicle in an effort "to erase evidence." He said that he left the key in the driver's seat of the vehicle. He stated that he was not attempting to kill the victim and that he wished the victim had not died.

The defendant did not put on any proof. The jury convicted the defendant of first degree (felony) murder, and the trial court sentenced him to life imprisonment. The defendant filed a timely motion for new trial, which the trial court denied. On April 17, 2015, the defendant filed a motion in this court requesting permission to waive the requirement of a timely-filed notice of appeal. This court granted the motion on April 29, 2015, and he filed his notice of appeal on May 1, 2015.

## ANALYSIS

On appeal, the defendant argues that the evidence is insufficient to sustain his conviction for felony murder in the perpetration of robbery. He also contends that the trial court erred when it did not instruct the jury regarding the offense of voluntary manslaughter.

## I. Sufficiency of the Evidence

The defendant argues that the evidence was not sufficient to sustain his conviction because there was evidence of "adequate provocation to cause the defendant to act out of a state of passion that led him to act in an irrational manner," making him guilty of voluntary manslaughter. He also argues that there is no evidence that he intended to permanently deprive the victim of his property because he returned the victim's car four days after the crime. The State responds that the evidence is sufficient.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v.*

4

*Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Tennessee Code Annotated section 39-13-202(a)(2) (2010) defines first degree murder as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." The culpable mental state required to sustain a conviction for felony murder is "the intent to commit the enumerated" felony. T.C.A. § 39-13-202(b). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). A theft occurs if, "with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). "'Deprive' means to: . . . [w]ithhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner." T.C.A. § 39-11-106(a)(8)(A).

For the offense of felony murder, "[t]he killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999). "Nevertheless, the 'intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim.'" *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting *Buggs*, 995 S.W.2d at 107).

Viewing the evidence in the light most favorable to the State, the defendant approached the victim when his back was turned. The defendant said that the victim recognized what the defendant "was fixing to do," and the victim attempted to hit him with a bottle. The defendant stabbed the victim in the back. The victim went into the restaurant, and the defendant followed him to obtain his car keys. The defendant's statement to police indicated that he wanted the victim's car keys so that he could sleep in the victim's car. After retrieving the keys, the defendant left the victim dying on the kitchen floor of El Toro Loco and drove away in the victim's car. From these facts, the jury could infer that the defendant had formulated the intent to deprive the victim of his property when he approached the victim and that he stabbed the victim to obtain the keys

5

to his vehicle. The fact that the defendant later brought the car back to El Toro Loco when he learned authorities were searching for it does not negate his intent to deprive the victim of the vehicle. We conclude that the evidence is sufficient to sustain the defendant's convictions

## II. Lesser Included Offense Instruction

The defendant argues that the trial court should have instructed the jury regarding the offense of voluntary manslaughter. He does not argue that voluntary manslaughter is a lesser included offense of felony murder. Instead, he contends that the trial court should have instructed the jury on voluntary manslaughter as a separate offense from felony murder because he waived his right to a grand jury indictment of the charge. The State notes that voluntary manslaughter is not a lesser included offense of felony murder and responds that the trial court did not have the authority to require the State to charge the defendant with voluntary manslaughter. The State also argues that the evidence did not justify an instruction for voluntary manslaughter.

At the conclusion of the proof, the defense requested an instruction on voluntary manslaughter as a lesser included offense of felony murder. The trial court denied the request, finding that voluntary manslaughter was not a lesser included offense of felony murder. As an alternative way to provide the instruction, the trial court asked the defendant if he would voluntarily waive his right to be indicted by a grand jury for voluntary manslaughter, and the defendant agreed. The prosecutor responded that the trial court properly concluded that voluntary manslaughter was not a lesser included offense and that it should not be included in the charge. The prosecutor also argued that the evidence was insufficient to support an instruction for voluntary manslaughter. The court found that there was insufficient evidence of adequate provocation or that the defendant was acting in a state of passion. The trial court instructed the jury only as to the lesser included offense of second degree murder.

A defendant is entitled to "a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). "A charge 'is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997)). A challenge to jury instructions presents a mixed question of law and fact, which this court reviews de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

Despite the defendant's concession, we must first determine whether voluntary manslaughter is a lesser included offense of felony murder. Tennessee Code Annotated

6

section 40-18-110 defines lesser included offenses. The statute provides that "[a]n offense is a lesser included offense if . . . [a]ll of its statutory elements are included within the statutory elements of the offense charged." T.C.A. § 40-18-110(f)(1). As we stated above, first degree (felony) murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery," and the culpable mental state required is "the intent to commit the enumerated" underlying felony. T.C.A. § 39-13-202(a)(2), (b). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation." T.C.A. § 39-13-211(a). The element of "passion produced by adequate provocation" is not included in the definition of felony murder. As a result, voluntary manslaughter is not a lesser included offense of felony murder under subsection (f)(1) of the statute.

The lesser included offense statute also specifically identifies several offenses as lesser included offenses of first degree murder. Subsection (g)(1) provides that "[s]econd degree murder is a lesser included offense of first degree murder as defined in § 39-13-202," and section 39-13-202 includes the definition of both premeditated murder and felony murder. T.C.A. § 39-13-202(a)(1), (2). Subsection (g)(2) of the statute goes on to state that "[v]oluntary manslaughter is a lesser included offense of premeditated first degree murder and second degree murder." The specific delineation of premeditated first degree murder in this subsection, rather than "first degree murder as defined in § 39-13-202" as used in subsection (g)(1), indicates that voluntary manslaughter is not a lesser included offense of felony murder.

A trial court has a duty to instruct the jury only regarding offenses that are lesser included offenses of the charged offense. *State v. Burns*, 6 S.W.3d 453, 467 (Tenn. 1999). "If a lesser included offense is not included in the offense charged, then an instruction should not be given, regardless of whether evidence supports it." *Id.* Because voluntary manslaughter is not a lesser included offense of felony murder, the trial court was not required to provide the instruction.

Further, the fact that the defendant unilaterally agreed to waive his right to an indictment on the charge of voluntary manslaughter does not then automatically require the trial court to provide the desired instruction. It is the prosecutor, not the trial court, who "has the sole duty, authority, and discretion to prosecute criminal matters." *State v. Harris*, 33 S.W.3d 767, 771 (Tenn. 2000) (quoting *State v. Spradlin*, 12 S.W.3d 432, 436 (Tenn. 2000)). "[T]he decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely within [the prosecutor's] discretion." *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)); *see also* T.C.A. § 40-18-110(e) ("When the defendant requests an instruction on a lesser included offense, the judge may condition the instruction on the defendant's consent to an amendment to the indictment or presentment, *with the consent of the district attorney general*.") (Emphasis

7

added).  Absent consent from the State, the mere fact that the defendant consented to an amendment of the indictment did not entitle him to an instruction on voluntary manslaughter.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the trial court.


_____
JOHN EVERETT WILLIAMS, JUDGE