IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned On Briefs May 21, 2003

## ALDEN JOE DANIEL, JR. v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Bradley County**
**No. M-01-392    Carroll L. Ross, Judge**

**No. E2002-02838-CCA-R3-PC**
**September 23, 2003**

Petitioner, Alden Joe Daniel, Jr., appeals the trial court's denial of his petition for post-conviction relief. In his initial brief filed with the assistance of retained counsel, Petitioner argues that the trial court erred in finding that Petitioner's plea of guilty was voluntary and knowing and in finding that Petitioner's trial counsel rendered effective assistance of counsel during the interval between Petitioner's first and second trial and during plea negotiations. After the filing of his initial brief, this Court granted Petitioner's counsel leave to withdraw as counsel and denied Petitioner's motion for the appointment of substitute counsel. Thereafter, Petitioner filed a motion to reconsider post-judgment facts pursuant to Rule 14 of the Tennessee Rules of Appellate Procedure and a *pro se* supplemental brief. In his brief, Petitioner alleges that his post-conviction counsel rendered ineffective assistance of counsel and that the trial court based its findings on erroneous facts. Petitioner requests that this Court remand the matter to the trial court for an evidentiary hearing as to factual matters not presented at Petitioner's post-conviction proceeding. For the reasons discussed herein, we deny Petitioner's motion to consider post-judgment facts and affirm the trial court's dismissal of the petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Cynthia Fort, Nashville, Tennessee, and Alden Joe Daniel, Jr., *pro se*, Wartburg, Tennessee for the appellant, Alden Joe Daniel, Jr.

Paul G. Summers, Attorney General and Reporter, Braden H. Boucek, Assistant Attorney General, Jerry N. Estes, District Attorney General, and Joseph Hoffer, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

**a. Background**

Petitioner was indicted on thirteen counts of statutory rape, sexual battery and rape stemming from allegations by various members of the girls' basketball team that Petitioner coached during the summer. After he was indicted, Petitioner fled the state and was apprehended approximately six months later. Following his return to Tennessee to stand trial, Petitioner was convicted of flight to avoid prosecution, but the jury could not reach a verdict as to the sexual offense charges. A second trial commenced later that summer. During the selection of the jury, a recess was called to explore the possibility of a plea settlement. After negotiations, Petitioner pled guilty to five counts of statutory rape, two counts of sexual battery and one count of rape with an effective sentence of nine years. This sentence was substantially less than the potential sentence Petitioner faced if he proceeded to trial and less than the twelve-year effective sentence initially offered by the State. In addition, the State agreed not to prosecute Petitioner's father, mother, former wife and daughter for perjury and/or for aiding Petitioner while he was a fugitive.

## b. Post-conviction Hearing

Petitioner initially filed a *pro se* petition for post-conviction relief alleging, among numerous other issues, (1) that his guilty plea was not entered into voluntarily or knowingly but was instead a product of duress and coercion prompted by the State's threat to prosecute his family if he did not plead guilty; (2) that his trial counsel rendered ineffective assistance of counsel during the interval between the first and second trial and during the plea negotiations; and (3) that the prosecution failed to turn over exculpatory evidence during the period between the first trial and the second trial.

In support of his petition, Petitioner testified that he only talked with his counsel one time between the conclusion of his first trial and the commencement of the second trial. When he arrived at the courthouse, Petitioner said that he had every expectation that the trial would begin. In the middle of jury selection, a recess was called, and Petitioner, along with his father, mother and former wife, met with Petitioner's counsel in a separate room. On the table were several documents which appeared to be warrants containing the names of Petitioner's family members. Although Petitioner was aware during his first trial that his family was vulnerable to prosecution for their assistance to him while he was absent from the state, the State had not pursued the filing of charges. Petitioner said that his counsel assured him that the family had not done anything wrong, so Petitioner was surprised to find out that arrest warrants had actually been prepared.

Petitioner said that the plea negotiations lasted only about fifteen minutes and included an agreement by the State not to press charges against his family. Petitioner testified that during the plea negotiations, his only concern was his family's potential arrests, although he admitted that the family members told Petitioner not to base his decision on what might or might not happen to them. Petitioner denied that trial counsel had discussed the additional incriminating evidence the State had gathered against him between the first and second trials. Specifically, Petitioner denied that his counsel told him that James McDonald, the friend who sheltered Petitioner during part of the time he was a fugitive, was prepared to testify for the State that Petitioner had acquired a tattoo below the waist for the sole purpose of confusing the victims on identification. Petitioner also denied that his

counsel told him that Mr. McDonald had informed the State that Petitioner had engaged in sexual intercourse with a fourteen-year-old girl while staying at Mr. McDonald's house.

At Petitioner's first trial, his former wife and daughter both testified that Petitioner was working at Charleston Hosiery Mill at the time one of the incidents allegedly occurred. Petitioner denied that his counsel told him that the State subsequently obtained the company's sign-in logs for that time period, and that the records did not support Petitioner's contention that he was working at Charleston Hosiery Mill at that time. Petitioner testified at the post-conviction hearing that he was working as an independent contractor and was not required to use the employee sign-in sheets. Petitioner said he was paid in cash and admitted that he did not pay federal income tax on this income. Petitioner also denied that counsel told him he had spoken to Detective Tony Alvarez who provided a summary of the evidence the State had to prosecute both Petitioner's former wife, Darlene Ledford, and his daughter, Brandy Daniel, for perjury pertaining to their testimony at the first trial.

Plaintiff, however, admitted that he was aware that the State had obtained the services of an expert witness to testify at Petitioner's second trial that the handwriting on correspondence to one of the victims was Petitioner's. Petitioner also knew that the State had discovered that a friend of one of the victim's had arranged Petitioner's rape by three or four men and that the State was in possession of Petitioner's medical records resulting from that incident. Petitioner was also aware that the secretary for Coach Pat Head Summit was prepared to testify at the second trial that a resume submitted by Petitioner to the University of Tennessee's women's basketball program contained a number of fraudulent statements. Petitioner, however, denied that he ever sent a resume to Coach Summit.

Petitioner testified that he received a copy of criminal injuries compensation reports submitted by two of the victims after he was in prison. One of the reports was filed five months before trial and indicated that at least one of the victims intended to file a civil suit against Petitioner and had contacted an attorney to act on her behalf. Petitioner said that the State should have provided his counsel with a copy of the report. One of the victim's mothers had testified at the first trial that she had not filed a lawsuit against Petitioner, and Petitioner argued that the compensation report could have been used to impeach the witness. In addition, Petitioner testified that he would not have pled guilty if he had known about the potential for a civil lawsuit.

Finally, Petitioner testified that his trial counsel provided ineffective assistance because of a conflict of interest between Petitioner and another client of counsel's, Dr. Cecil Knight. Although not exactly clear from Petitioner's testimony, it appears that Petitioner and Dr. Cecil Knight were on opposite sides of a lawsuit totally unrelated to Petitioner's criminal trial. Petitioner admitted that it was the district attorney who initially raised the issue of a conflict of interest. Petitioner and his counsel resisted the State's motion to disqualify Petitioner's trial counsel and, after a hearing, the trial court concluded that no conflict of interest existed. During the hearing, Petitioner waived any conflict that might exist and expressed his desire to retain trial counsel to assist him at trial.

Robert Owenby, a former employee of Charleston Hosiery Mill, testified that he knew Petitioner was a security guard at the facility some time in 1997 but could not recall the exact time period that Petitioner worked there. Mr. Owenby also said he thought Petitioner was hired as an independent contractor rather than an employee but did not know how Petitioner was paid.

Christal Ward, a member of Petitioner's basketball team, said that she was prepared to testify at trial that one of the victim's mothers had approached her about joining a potential civil lawsuit against Petitioner. Ms. Ward interpreted the telephone call as an invitation to lie so that she could share in any money recovered from Petitioner. Ms. Ward admitted, however, that once she told the woman that she had not been the recipient of any sexual advances from Petitioner, she never heard anything more about the potential lawsuit. Ms. Ward was not called as a witness at the first trial nor scheduled as a witness at the second trial.

Petitioner's father, Alden Joe Daniel, Sr., testified that Petitioner's counsel told him that the State had prepared a warrant for his arrest during their conference on the morning the second trial commenced. Mr. Daniel said that prior to this he and his wife had periodically checked with the court to see if any warrants had been issued. Mr. Daniel was shocked when he learned that Petitioner was considering a plea arrangement, but he did not discuss the proposal with his son. Although Mr. Daniel knew that Petitioner stayed with Mr. McDonald while he was a fugitive, he denied providing his son any food or money. During this time, Mr. Daniel did, however, try to secure the services of an attorney for Petitioner.

Darlene Ledford, Petitioner's ex-wife, testified that she saw what she thought were arrest warrants the morning the second trial started. Based on these papers, Ms. Ledford felt that she was about to be arrested. She did not believe, however, that the State could secure a conviction against her. Ms. Ledford told Petitioner not to accept the plea based on the arrest warrants.

Petitioner's trial counsel testified that he interviewed approximately sixty-eight potential witnesses in preparation for the first trial and employed Regina Shepard as a paralegal to assist him. He created a detailed calendar chronicling Petitioner's whereabouts on the dates for the alleged offenses. Counsel explained each element of the charged offenses to Petitioner as well as the possibility of consecutive as opposed to concurrent sentences. These discussions were repeated in the interval between the first trial and the second, and at some point, Petitioner authorized counsel to talk with the State about a possible plea agreement. During this period, counsel met with Petitioner twice, and Ms. Shepherd also met with Petitioner two times to explain the new evidence secured by the State. The issue of the family being arrested as accessories after the fact and for perjury was always present, and counsel, in addition to Mr. and Mrs. Daniel, Sr., checked periodically to see if an application for a warrant had been filed.

Counsel testified that he was aware prior to Petitioner's first trial that the victims intended to file a civil lawsuit against petitioner. Counsel spoke to the attorney initially hired by the victims, but the attorney later withdrew from the case. A civil lawsuit was not filed until some time later and was pending at the time of the post-conviction hearing.

Counsel's primary concern after the first trial was the State's discovery of additional evidence that was unfavorable to Petitioner. First, Mr. Burris had initially agreed to testify at Petitioner's first trial but changed his mind when he could not find any records to support his testimony that Petitioner was working at Charleston Hosiery in 1997. Instead, Mr. Owenby testified about Petitioner's employment at the first trial. Before the second trial, the State contacted Mr. Burris and obtained the company's work log, and Mr. Burris told counsel that his testimony at the second trial would not be favorable to Petitioner. Because the sign-in logs raised substantial questions about Petitioner's employment, counsel was also cognizant that Ms. Ledford, Ms. Daniel, and Mr. Owenby were vulnerable to perjury charges.

In addition, Mr. McDonald approached counsel before the second trial and told him of the additions to his testimony that would be presented at the second trial including Petitioner's motivation behind securing his tattoo and his sexual activities while staying with Mr. McDonald. Finally, counsel said that the victims were now familiar with the way counsel conducted his cross-examination and would be better prepared at a second trial.

The discussions between the two trials, counsel said, focused on the potentially negative impact of the State's newly discovered evidence on a second trial and the substantial sentence Petitioner was potentially facing. Although the arrest of family members was always a possibility, the family continued to protest that this factor should not be considered in Petitioner's decision as to whether or not to plead guilty to the charges.

During the recess at the second trial, counsel initiated a conversation with Detective Alverez concerning the status of any prosecution against the family. Detective Alverez said that he had filled out applications for warrants, but the warrants had not yet been filed. As a result, counsel and Petitioner were adamant that the State's agreement not to prosecute the family members be included in the plea negotiations. After Mr. McDonald indicated to counsel that the family had supplied Petitioner with money, counsel felt that the case against the family members gave the State at least a reasonable opportunity to secure a conviction.

Counsel testified that he viewed the conflict revolving around his representation of both Dr. Knight and Petitioner as simply an effort by the State to remove him from the case. Petitioner had told the trial court that he waived any conflict and wanted counsel to represent him at trial.

At the conclusion of the hearing, the trial court concluded that Petitioner failed to prove by clear and convincing evidence his allegation that his guilty plea was the result of coercion. The trial court found that Petitioner appeared intelligent throughout the hearing and was more sophisticated than most people who passed through the courtroom. The transcript of the plea acceptance hearing showed that Petitioner had repeatedly assured the court that he fully understood his rights and voluntarily waived those rights by accepting the State's plea offer. The issue of the potential prosecution of Petitioner's family members either for perjury or as accessories after the fact had been present from the beginning. So long as the State violated none of Petitioner's constitutional rights, an agreement not to prosecute the family further was a proper factor in the plea negotiations. The

trial court further found that petitioner offered no evidence at the post-conviction hearing that he was prejudiced by his counsel's assistance or that he would not have pled guilty but for his counsel's conduct. Finally, the trial court concluded that the State did not commit any acts that would rise to the level of prosecutorial misconduct. Based on the foregoing, the trial court dismissed Petitioner's petition for post-conviction relief. As to all conflicting testimony, the trial court specifically accredited the testimony of Petitioner's counsel and did not find Petitioner credible.

Petitioner appealed and argues that the trial court erred in finding that his guilty plea was voluntarily and knowingly made and not the product of the State's coercion. Furthermore, Petitioner asserts that counsel rendered ineffective assistance because Petitioner did not understand the nature and consequences of his plea, his plea was unlawfully obtained because Petitioner only pled guilty in response to the State's threats against his family, and counsel's representation of both Petitioner and Dr. Knight was an impermissible conflict of interest.

After Petitioner's brief was filed, he dismissed his retained post-conviction counsel and moved that she be allowed to withdraw as his attorney. This Court subsequently entered an order permitting Petitioner's post-conviction counsel to withdraw. Petitioner then filed a *pro se* supplemental brief alleging that his post-conviction counsel had rendered ineffective assistance of counsel because she (1) failed to adequately investigate the circumstances surrounding his guilty plea; (2) failed to include an allegation in the post-conviction petition that Petitioner's trial counsel had erroneously advised him as to his eligibility for parole if he pled guilty; and (3) failed to adequately investigate the State's claim that witnesses from the first trial were not willing to testify at Petitioner's second trial. Petitioner's supplemental brief also contains a general allegation that the trial court based its decision to dismiss Petitioner's petition for post-conviction relief on erroneous facts. In support of this last allegation, Petitioner filed numerous affidavits obtained after the conclusion of the post-conviction hearing in addition to portions of the record from Petitioner's first trial. None of this information was presented to the post-conviction court.

**c. Analysis**

1. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). The trial court's findings of fact in a post-conviction hearing are afforded the weight of a jury verdict. *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App.1990). Therefore, this Court may not re-weigh or re-evaluate these findings nor substitute its inferences for those of the trial judge unless the evidence in the record preponderates against those findings. *State v. Honeycutt*, 54 S.W.3d 762, 763 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). In addition, questions concerning the credibility of witnesses and the weight and value given their testimony is resolved by the post-conviction court, and not this Court. *Id.* However, the trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450,

458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to *de novo* review. *Id.*; *Burns*, 6 S.W.3d at 461.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984). In the context of a guilty plea, a petitioner must show that he or she would not have pleaded guilty and would have insisted on going to trial had it not been for the deficiencies in counsel's performance. *Hill v. Lockhart,* 474 U.S. 52, 56-57, 106 S. Ct. 366, 369-70, 88 L. Ed. 2d 203 (1985).

In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id.* at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State,* 960 S.W.2d 572, 580 (Tenn. 1997), *cert. den.* 525 U.S. 830, 119 S. Ct. 82, 142 L. Ed. 2d 64 (1998). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

2. Involuntary Guilty Plea

Petitioner alleges that his guilty plea was solely the product of the State's threats to prosecute his family members for harboring a fugitive and for perjury. As a result, Petitioner contends that his guilty plea was not voluntarily or intelligently given in violation of the principles enunciated in *Boykin v. Alabama,* 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969).

By entering a plea of guilty, the accused waives several constitutional rights including the privilege against self-incrimination, the right to a trial by jury, and the right to confront witnesses. *Id.* at 243, 89 S. Ct. at 1714. For this waiver to be valid under the Due Process Clause, the plea must be voluntarily, understandingly and knowingly entered. *Id.* at 243, 89 S. Ct. at 1713; *Blankenship v. State*, 858 S.W.2d 897, 902 (Tenn. 1993). A plea is not "'voluntary' if it is the product of 'ignorance, incomprehension, coercion, terror, inducements, [or] subtle or

blatant threats. . . .'" *Blankenship,* 858 S.W.2d at 904 (quoting *Boykin*, 395 U.S. at 242-3, 89 S. Ct. at 1712). If an accused is fully aware of the direct consequences of his plea which may include the value of any commitments made by the prosecutor, then the plea must stand "unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)." *Brady v. United States*, 397 U.S. 742, 755, 90 S. Ct. 1463, 1472, 25 L. Ed. 2d 747 (1970) (quoting *Shelton v. United States,* 246 F.2d 571, 572 n. 2 (5th Cir. 1957) (en banc), *rev'd on other grounds*, 356 U.S. 26, 78 S. Ct. 563, 2 L. Ed. 2d 579 (1958)).

The trial court must ascertain if the petitioner fully understands the significant consequences of his or her plea. *Blankenship*, 858 S.W.2d at 904-5 (quoting *Brown v. Perini*, 718 F. 2d 784, 788 (6th Cir. 1983)). When making its determination, the trial court may consider a number of factors including the petitioner's relative intelligence, his familiarity with criminal proceedings, whether he was represented by competent counsel and had the opportunity to confer with counsel about his options, the advice given by counsel and the trial court about the charges against him and the penalty to be imposed, and the petitioner's reasons for pleading guilty. *Blankenship*, 858 S.W.2d at 904-5.

The trial court in this instance found that Petitioner was more than capable of comprehending the plea process and was familiar with court proceedings because he had just been through a trial on the very same offenses. Petitioner executed a plea agreement stating that he understood the charges against him, that he voluntarily waived his right to a jury trial and an appeal if convicted, and that he fully understood the offer presented by the State. In addition, the trial court reviewed each of these issues with Petitioner personally at the plea submission hearing. Testimony offered by Petitioner's counsel showed that the possibility of prosecution of Petitioner's family members existed from the beginning. *See* Tenn. Code Ann. § 39-11-411. In addition, the State had obtained information in the interval between the first and second trial concerning Petitioner's alibi for one of the alleged offenses that left his former wife and daughter vulnerable to prosecution for perjury. The trial court concluded that it was not impermissible for the State to use these potential prosecutions as a bargaining tool during plea negotiations with Petitioner.

The trial court further found that Petitioner's counsel had discussed each element of the charged offenses and the potential exposure Petitioner faced if convicted of all charges. Petitioner's counsel advised him that the State's case had grown stronger since the first trial, and some of Petitioner's witnesses were now unwilling to testify or might even testify for the State. Based on these findings, the trial court concluded that Petitioner's plea was not the result of coercion on the part of the State but was entered into voluntarily and intelligently.

Petitioner argues that the totality of the circumstances surrounding Petitioner's plea of guilty preponderates against the trial court's finding that Petitioner's plea was not coerced.

Petitioner contends that he was willing to proceed to trial and only pled guilty to save his family from prosecution.

An accused may plead guilty, not guilty, or nolo contendere to the charges against him and may change his plea during the course of a trial. *Parham v. State*, 885 S.W.2d 375, 379 (Tenn. Crim. App. 1994); Tenn. R. Crim. P. 11(a). An accused does not have a constitutional right to a plea agreement, nor is the State required to enter into plea bargaining. *State v. Head*, 971 S.W.2d 49, 50 (Tenn. Crim. App. 1997); *Parham*, 885 S.W.2d at 382. Nonetheless, the State has a "legitimate interest in encouraging the entry of guilty pleas and in facilitating plea bargaining, a process that is mutually beneficial to both the defendant and the State." *State v. Mann*, 959 S.W.2d 503, 510 (Tenn. 1997), *cert. denied* 525 U.S. 956, 118 S. Ct. 2376, 141 L. Ed. 2d 743 (1998). Both parties to the plea negotiations necessarily have their "own reasons for wanting to avoid trial." *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S. Ct. 663, 668, 54 L. Ed. 2d 604 (1978). Our supreme court has noted, however, that "[p]lea negotiations often give rise to difficult choices for a defendant." *Mann,* 959 S.W.2d at 511.

As the State points out, if multiple defendants are involved in the offense, the State may extend an offer of a plea agreement contingent on all co-defendants accepting the offer and pleading guilty. *Parham*, 885 S.W.2d at 382. The State need not extend the same offer to all defendants. *See Head*, 971 S.W.2d at 51. Yet, one defendant may be motivated to enter into a plea agreement to secure leniency for another co-defendant without such motivation invalidating the otherwise voluntary nature of the plea. *See Parham*, 885 S.W.2d at 385 (Defendant voluntarily pled guilty to save his co-defendant from the possibility of a death sentence.). In a series of cases arising out of the killing of four members of the Lillelid family, this Court determined that the desire of the various co-defendants to save one another from a death sentence through the entry of guilty pleas is a legitimate reason to accept a plea agreement. *See Risner v. State*, No. E2002-01112-CCA-R3-PC, 2003 WL 21492929, at *7 (Tenn. Crim. App. Knoxville June 30, 2003). The defendant's motivation for pleading guilty is only one factor to consider when reviewing the totality of the circumstances surrounding the entry of the guilty plea. *Blankenship,* 858 S.W.2d at 904-5*; Parham*, 885 S.W.2d at 385.

In this instance, Petitioner's family members had not yet been indicted. So long as the district attorney has probable cause, the decision of whether to prosecute and what charges to bring against the accused rests solely within the discretion of the prosecutor. *State v. Spradlin*, 12 S.W.3d 432, 436 (Tenn. 2000) (quoting *Ramsey v. Town of Oliver Springs*, 908 S.W.2d 207, 210 (Tenn. 1999); *see Hayes*, 434 U.S. at 364, 98 S. Ct. at 668. Promises, on the other hand, made to persuade the defendant from proceeding to trial that are not related to the prosecutor's business invalidate a guilty plea. *Brady v. United States*, 397 U.S. at 755, 90 S. Ct. at 1472. "Almost anything lawfully within the power of a prosecutor acting in good faith can be offered in exchange for a guilty plea." *United States v. Pollard*, 959 F.2d 1011, 1021 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 915, 113 S.Ct. 322, 121 L. Ed. 2d 242 (1992). In *Hayes*, the supreme court expressly reserved judgment on the constitutional implications of a prosecutor's promises of leniency to a third party during plea negotiations. *Hayes*, 434 U.S. at 365 n.8, 98 S. Ct. at 669.

Since that time, however, the federal circuit courts have consistently found that "a plea is not invalid if entered (a) under a plea agreement that includes leniency for a third party or (b) in response to a prosecutor's justifiable threat to prosecute a third party if the plea is not entered." *United States v. Marquez*, 909 F. 2d 738, 741 (2nd Cir. 1990), *cert. denied,* 498 U.S. 1084, 111 S. Ct. 957, 112 L. Ed. 1045 (1991) (citations omitted).

The possibility that Petitioner's family might be prosecuted for their role in assisting or concealing him during his flight was present during Petitioner's first trial, and in the ensuing interval between the conclusion of the first trial and the commencement of the second trial. *See* Tenn. Code Ann. § 39-11-411. During this time, Petitioner's parents as well as his trial counsel periodically checked with the court clerk to see if warrants had been filed. Although Mr. Daniel, Sr. testified that he did not provide his son physical assistance, Mr. McDonald told Petitioner's counsel that the Daniels provided money to their son. Based on the information he received, counsel testified that he believed the State would have enough proof to sustain a conviction, although he felt that the State's case would not be helped by the credibility problems surrounding Mr. McDonald. Nonetheless, counsel was acutely aware of the Daniels' exposure during cross-examination in the event they testified at the second trial and prepared them for trial accordingly.

Counsel also testified that the information gathered by the State between trials raised substantial questions about the validity of the testimony of Petitioner's former wife and daughter concerning Petitioner's employment at Charleston Hosiery Mill. Despite these factors, each family member repeatedly urged Petitioner not to consider their plight when deciding whether or not to plea.

Counsel testified that he, Petitioner, Ms. Shepherd, General Hoffer and General Crump met briefly in a separate room during the recess on the first morning of the second trial to explore the possibility of a plea negotiation. At some point, counsel left the room and initiated a conversation with Detective Alvarez concerning the status of any prosecution against Petitioner's family. Detective Alvarez informed counsel that he had completed the necessary affidavits of complaint and applications for warrants for Mr. Daniel, Sr. and Ms. Ledford. Counsel took the paperwork into the conference room and requested that the State agree not to prosecute members of the Daniel family as a part of the plea agreement.

Petitioner was initially indicted on thirteen counts of rape, statutory rape and sexual battery. As a result, he faced significant sentencing exposure if convicted. Petitioner pled guilty to five counts of statutory rape, two counts of sexual battery and one count of rape and received an effective sentence of nine years. At the plea submission hearing, Petitioner said that he understood the plea agreement and the constitutional rights he was foregoing by entering a guilty plea. Petitioner testified that no one had threatened or made any promises or otherwise coerced him into entering the plea agreement and admitted that he had committed the offenses outlined by the State in its factual basis for the plea. Furthermore, the trial court specifically found Petitioner's post-conviction hearing testimony to be without credibility. Based on our review of the totality of the circumstances surrounding Petitioner's guilty plea, we find that the evidence

does not preponderate against the trial court's finding that Petitioner's plea was entered into voluntarily and intelligently. Petitioner is not entitled to relief on this issue.

### 3. Ineffective Assistance of Counsel

Petitioner alleges that his trial counsel rendered ineffective assistance of counsel because Petitioner did not have a clear understanding of the nature and consequences of his guilty plea and the plea was unlawfully induced. Petitioner also alleges that his trial counsel provided ineffective assistance because he was acting under a conflict of interest resulting from the representation of both Petitioner and Dr. Knight. Petitioner does not support his assertions with any specific proof or citations to authority. We do note, however, that "an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest." *State v. Thompson*, 768 S.W.2d 239, 245 (Tenn. 1989), *cert. denied*, 497 U.S. 1031, 110 S. Ct. 3288, 1031 L. Ed. 2d 796 (1990). Ineffective assistance of counsel may result if counsel's performance is affected by a conflict of interests. *Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067. This conflict, however, must be more than just a potential conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). "An actual conflict of interest is usually defined in the context of one attorney representing two or more parties with divergent interests." *State v. Tate,* 925 S.W.2d 548, 552 (Tenn. Crim. App. 1995). Prejudice is presumed "if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067; *Netters v. State,* 957 S.W.2d 844, 847 (Tenn. Crim. App. 1997).

The best we can gleam from the record is that Petitioner's counsel represented Dr. Cecil Knight who pled guilty to 23 unspecified felony charges and three misdemeanor charges prior to Defendant's first trial. The charges apparently arose out of a medical malpractice claim that involved one of the hospital's respiratory therapists who was also the wife of an assistant district attorney. Defendant apparently was working at the hospital at the time the alleged incident occurred and had some information relevant to the hospital's culpability. Whether he was ever called to testify or give a deposition in the matter is not clear. At the post-conviction hearing, Defendant alleged somewhat vaguely that his counsel might not call certain witnesses in his defense because they would hurt Dr. Knight's case. He does not say how this dual representation affected counsel's representation during the plea negotiation process.

Counsel testified that the District Attorney brought the issue of a potential conflict of interest resulting from his representation of Dr. Knight to the trial court prior to Petitioner's first trial, and a hearing was held concerning the matter. In his testimony, counsel seems to suggest that the daughter of the alleged victim of the malpractice claim might have been a potential witness for Petitioner. There is no mention of whether the young lady testified or not. Counsel felt that the District Attorney's motion was simply an attempt to remove counsel from Petitioner's case. Counsel testified that the trial court denied the State's motion to disqualify, and during the hearing Petitioner waived any potential conflict of interest and expressed the desire to retain him as counsel.

-11-

"The right to counsel includes the qualified right to the counsel of one's choice." *State v. Parrott,* 919 S.W.2d 60, 61 (Tenn. Crim. App. 1995) (citing *Wheat v. United States*, 486 U. S. 153, 108 S. Ct. 1962, 100 L. Ed. 2d 140, *reh'g denied*, 487 U.S. 1243, 108 S. Ct. 2918, 101 L. Ed. 2d 949 (1988)).  Counsel generally will not be disqualified absent a showing of an actual conflict rather than the potential for conflict.  *State v. Culbreath,* 30 S.W.3d 309, 312-13 (Tenn. 2000).  A defendant who has retained counsel will not be deprived of the counsel of his choice in a situation where a conflict of interest is present if the defendant "knowingly and intelligently affirms his choice."  *Parrott*, 919 S.W.2d at 61 (citing *United States v. Valenzuela*, 521 F. 2d 414, 416 (8th Cir. 1975), *cert. denied*, 424 U.S. 916, 96 S. Ct. 1117, 47 L. Ed. 2d 321 (1976)).

Based on our review of the record, we cannot conclude that Defendant has carried his burden of proving by clear and convincing evidence that his trial counsel actively represented conflicting interests and that an actual conflict of interest adversely affected counsel's performance.  We also find that the evidence does not preponderate against the trial court's finding that counsel provided effective assistance during the plea negotiations and plea submission hearing.  Defendant is not entitled to relief on this issue.

### 4.  Petitioner's Supplemental Brief

After his post-conviction counsel was permitted to withdraw from his case, Petitioner filed a *pro se* supplemental brief in which he alleged that his post-conviction counsel provided ineffective assistance of counsel because (1) she failed to adequately investigate Petitioner's claim that he only pled guilty in response to the State's threat to prosecute his family; (2) she failed to include within the post-conviction petition an allegation of ineffective assistance of trial counsel based on trial counsel's failure to properly advise Petitioner about parole eligibility; and (3) she failed to adequately investigate the State's claim that witnesses were not willing to testify for Petitioner at the second trial.  Petitioner also alleges in his supplemental brief that the post-conviction court based its findings on erroneous facts.  In support of his position, Petitioner submitted portions of the first trial's records and numerous affidavits which he obtained after the conclusion of the post-conviction hearing.  Petitioner asks us to remand this matter for a new evidentiary hearing so that he may present additional evidence on previously raised issues or present new grounds for relief.

We first consider Petitioner's request that we consider what he terms post-judgment facts to determine "exactly what happened in this case."  Petitioner filed a *pro se* motion pursuant to Rule 14(a) of the Tennessee Rules of Appellate Procedure during the pendency of his appeal. This Court took Petitioner's motion under advisement.

Under certain limited circumstances, an appellate court may consider facts pertaining to a matter which arise after entry of the trial court's judgment.  *See State v. Williams*, 52 S.W.3d 109, 122 (Tenn. Crim. App. 2001).  The authority of Rule 14 "generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief

from the judgment requested or granted in the trial court, and other similar matters." Tenn. R. App. P. 14(a). Facts which are not appropriate for consideration under Rule 14 include those which are merely cumulative, could be controverted or contested when presented to the trial court, and which might lead to differing opinions or conclusions. *Duncan v. Duncan,* 672 S.W.2d 765, 767 (Tenn. 1984). Rule 14, therefore, "is not intended to permit a retrial in the appellate court." Tenn. R. App. P. 14, Advisory Commission Comments.

Petitioner submitted various affidavits with his supplemental brief. One group represents statements from the witnesses at Petitioner's first trial that they would have testified on his behalf at a second trial. Another set of affidavits contain statements from individuals that Petitioner worked at Charleston Hosier "for a given time" as support for the testimony of Petitioner's former wife and daughter during the first trial.

Because this Court's jurisdiction is appellate only, we do not possess the authority to conduct hearings and determine disputed issues of fact. *See State v. Workman*, 22 S.W.3d 807, 808 (Tenn. 2000); *Duncan*, 672 S.W.2d at 767; Tenn. Code Ann. § 16-5-108. The facts presented through Petitioner's Rule 14 motion and supplemental brief did not arise after the post-conviction court's judgment. The affidavits were merely filed post-judgment raising issues already addressed by the post-conviction court. These issues go to the merits of Petitioner's case and involve disputed matters subject to differing opinions. There is no doubt that the facts presented and the conclusions drawn in Petitioner's affidavits would be open to contest by the State if presented to the post-conviction court. Accordingly, Petitioner's motion to consider post-judgment facts is denied.

We turn next to Petitioner's contention that his post-conviction counsel rendered ineffective assistance of counsel. Petitioner complains that his post-conviction counsel did not adequately investigate whether the State had reasonable cause for prosecuting his family members and failed to interview Petitioner's witnesses at the first trial as to their amenability to testifying at the second trial. However, our supreme court has clearly held that there is no constitutional right to effective assistance of counsel in a post-conviction proceeding. *House v. State*, 911 S.W.2d 705, 712 (Tenn. 1995), *cert. denied*, 517 U.S. 1193, 116 S. Ct. 1685, 134 L. Ed. 2d 787 (1996). Although Petitioner has a statutory right to counsel to assist him with his post-conviction petition and proceeding, there is no statutory right to effective assistance of counsel. *Id.* As a result, Petitioner's claims are without merit.

Petitioner finally alleges that the post-conviction court based its judgment on erroneous facts. Essentially, Petitioner asks us to remand this matter so that he may relitigate his post-conviction claims. Post-conviction proceedings are governed by the Post-conviction Act of 1995. Tenn. Code Ann. § 40-30-201. The Act specifically permits the filing on only one post-conviction petition except for certain limited exceptions which are not applicable here. *Id.* -202. Petitioner was afforded the opportunity at a full and fair hearing to present his evidence and cross-examine witnesses, and he is bound by the action or inaction of his post-conviction counsel. *See House*, 911 S.W.2d at 714; Tenn. Code Ann. § 40-30-206(h). The allegation of

Petitioner in this case that he should be granted a new post-conviction hearing because the post-conviction court based its judgment on erroneous facts is without merit.

## CONCLUSION

After a careful review of the record in this matter, we affirm the judgment of the trial court.

                                    _____

                                    THOMAS T. WOODALL, JUDGE